We're going to move now to Appeal 24-2163 Slaughter v. Hartford. We'll begin with oral argument from Mr. Davis. Thank you, your honors. May it please the court. This case involves long-term disability benefits, a denial of long-term disability benefits under the employee retirement income security act. It was tried by the court under a de novo standard of review under Rule 56A. It was a trial on the papers. The court found against Mr. Slaughter, and we believe that in doing so, the court committed a couple of instances of clear error. Could you just give us a ballpark, it won't be held to it, as to how much money we're talking about here? I understand that Mr. Slaughter's annual salary was in the range of $130-$150,000. How much money are we talking about? Well, so in this specific instance, we're talking about two years of benefits because we were still under the definition, under the policy of his own occupation. After two years, the definition of disability changed to any occupation. So Hartford and the court never considered any occupation because we were only appealing and before the court, after that denial of the appeal, on the two years. So it would be probably 75% of benefits minus a social security offset because the policy will short. So I don't know the answer, but at this point it's not a lot. However, if clear error is found and it were found that he was wrongfully denied those disability benefits, it would have to go back, I believe, procedurally to Hartford to start the process over again for an appeal, for a filing and an appeal of those, any occupation benefits, which would go to his normal retirement age, and I think he was around 50. So I'm going to guess ballpark total $600-$700,000, but before this court, probably less than $100 if you take in the Mr. Davis, before we get into the merits too much, I want to clarify something about the procedure here. So the parties had stipulated to a process under Rule 52, and you moved for summary judgment under Rule 56. Hartford moved under 52 and the court proceeded under Rule 52 with the trial on the papers. Are you arguing that it was reversible error for the district court to proceed under Rule 52? No, I'm not. I don't think that in the end it makes a difference based on how the court got to its decision. So you're not challenging the court enforcing that stipulation? I'm not challenging the court in that stipulation because I think in the end what the court, the way that it arrived at the decision, didn't necessarily do a de novo review. It did more of a clear review of the evidence, and I think that's part of the error. Because if you look at the court's decision, and it really comes down to the application of the vocational analysis to this claim. So in a long-term disability policy, you really have two components. One, you have the medical component. What is this person suffering from? Have they met their burden of proof to say that they have this diagnosis? And then what are the restrictions and limitations that are caused by that? And then you have to do a vocational analysis. And that becomes very important because under this court's precedent under Tate and Doris, on a claim like this, where you're looking at a sedentary job, but you're looking at a medical condition that has a variety of components to it, you have to then go to the vocational analysis to look at the totality of those circumstances. You've criticized the court's handling of the vocational analysis and argued that the court really looked at it as a functional capacity analysis. But when you read the report, Gonzalez's report, which is titled Vocational Analysis, throughout the entire report, there's an analysis of the limitations on the functional capacity. So it sounds to me like you are arguing form over substance by saying that the title of that document should control how the court looks at it. Well, she is a vocational expert. I understand that. But throughout that, she is giving opinions about physical and mental residual functional capacity. And I mean, certainly that is something that Hartford could have rebutted with their own vocational analysis, that the medical records... But my point is, it wasn't vocational. It was really focused on functional capacity. And that's how the court analyzed it. And you're claiming the court erred in analyzing it from a functional capacity standpoint. But it is throughout that document, Gonzalez includes her own assessment of the functional capacity. Well, and the court called the report a functional capacity evaluation. The court specifically criticized Dr. Gonzalez for not doing a physical examination of Mr. Slaughter. I guess that's my question. How could it be error for the court to look at this report as a functional capacity report, when throughout the entire report, Gonzalez gives her opinion as to the residual functional capacity? Well, I think what she's giving is her opinion as looking at the medical records and those restrictions and limitations that are seen in those. And that includes objective or subjective complaints by Mr. Slaughter to his medical providers, where he talks about shortness of breath. He talks about how, at times, he does feel faint. He talks about his overexertion and that he becomes tired. And so what the vocational expert does is take all of that information from those records, not performing her own medical evaluation, not performing a physical evaluation, and then taking that, using her expertise, to evaluate the totality of the circumstances based on the job restrictions. Mr. Davis, can I ask you the same question in a different way?  When I read your brief, I see that you described Dolores Gonzalez, I think accurately, as a vocational person, a vocational rehab expert. And then you make arguments in your brief that there was error committed because the district court evaluated that vocational rehab expert as if she was performing what you call a functional capacity evaluation. I'm lost in the labels. Can you just tell me what you're trying to say? And that was not what we were, so the district court called it a functional capacity evaluation. I'm not going to talk. I want you to talk. I just want you to explain in the courtroom what is the error that you think happened? So a functional capacity evaluation, and there's case law talking about this in LTD cases, is usually done by a physical therapist. It's a series of physical tests to determine how much can a person lift, what is the strain on them. There's a whole purported number of tests that they do, and the courts have talked about that. The district court applied those cases, talking about some short fallings or some criticisms of functional capacity evaluations, and applied it to Dr. Gonzalez's report. Dr. Gonzalez's report has nothing to do with her own physical testing of the plaintiff. Hers is simply to examine the totality of the medical records. In addition to that, she also does a vocational interview. This is what vocational experts do. They talk to the claimant to determine what their abilities could be to find some sort of level of employability. So what the court did was to apply the standards which the jurisprudence has on functional capacity evaluations and long-term disability tests, those physical therapy tests, and what do they show and not show, and applied it to a vocational analysis, which is a completely different thing and for a completely different purpose. And as this court has said in Tate and Dorries, that vocational analysis becomes important because here we really end up talking about, does this job require this systems engineer to do anything besides sit? And the district court said that the critical important part that the court was looking at was, can he sit for eight hours a day? And it's important to look not only at the definition that the court applied of sedentary, which says standing and walking may occasionally be applied, the definition of occasionally that was applied, which is up to two-thirds of the day, and then the restrictions and limitations provided by the physicians. There's no physician that examined Mr. Slaughter that said that he could walk during the day for two-thirds of the work day. And so when we get into that type of analysis, that's where this court has said a vocational expert looking at the totality of the circumstance becomes very important. Now Hartford could have done their own vocational analysis and we could have had those competing looks at these two different reports. Hold on. I'm having a heck of a time following what's being argued. You're saying the district court's heir was not evaluating whether he could walk for up to two-thirds of a day? I thought his job, as you just said a minute ago, I thought his job, I thought he was an IT guy. It's under the definition. I thought he was sitting at a desk doing IT work. He is a systems engineer in a manufacturing plant. He worked at the Boeing manufacturing plant in St. Louis. Right, but and that job required him to be on his feet walking around for two-thirds of the day? And he had to make visits to other parts of the facility. And he had to walk around this massive facility. And that is something which in the middle of the road- But that's a Boeing-specific job, to have to walk around. That's not the standard that the policy calls for when you look at disability. It's the job generally. Yeah, this business about your occupation or whatever that is called. And in the national economy, everyone agreed that the definition that was applied was systems engineer, which is Department of Occupational Titles. And that does allow for the job to also have a requirement that you would walk occasionally. Occasionally means up to two-thirds of the day. So it is not sitting all the time. And so a sedentary job is not that you are chained to the desk in every single instance. There is a limited amount of walking that is required. And Mr. Slaughter is very limited in his ability to do that specific function. Would you like to reserve the remainder of your time? Yes, thank you. Thank you, Mr. Davis. Ms. Herring, we'll go to you now for an argument on behalf of the appellee. Good morning. May it please the Court. Jacqueline Herring on behalf of Hartford Life and Accident Insurance Company. I'll start where we sort of left off. Occasional isn't two-thirds, it's one-third. And what Mr. Slaughter's cardiologist said he could do is that he could stand up to two hours during the day, walk up to one hour during the day. That's three hours total of an eight-hour day. Clearly meets that standard. Occasional isn't two-thirds of the time doing it. So I think that was perhaps just a misstatement of what that means. Because it's described in the district court's opinion as approximately two hours or two-and-a-half hours is how the was defined. And so the treating cardiologist, Dr. Ellison, actually did find in his very specific findings that that was something that could be done. But really the fundamental issue here is whether the district court's weighing of the evidence created a clear error. It's not clear error simply because there may be a different opinion out there. It's not plausible what the district court decided. And what the district court decided here was not only entirely plausible, but the court followed exactly what the court is supposed to do. Identify what is that occupation, what does that occupation require? The judge did that very clearly in the opinion. The district court laid out exactly what the job requires. It's a sedentary job. He laid out what those physical sedentary requirements are. And the judge also laid out what are the duties of that job, what are the mental requirements of that job. The district court went through all of those steps, went through all of the different medical evidence from all different sources, and said that he found most persuasive the treating cardiologist, Dr. Ellison. And so he looked at those specific, and again Dr. Ellison was very specific, so it was kind of an easy task, right? Dr. Ellison says no limitations on his ability to sit. Well, when you're looking at a sedentary occupation, the district court acknowledged that's an important fact. Can you speak to the argument Mr. Davis is making? Because I've read everything here, I think I'm missing something completely. He's arguing that there was an error because Dolores Gonzalez was treated as if she did a functional capacity evaluation. There is no question the district court was aware of Dolores Gonzalez, focused on Dolores Gonzalez and her views, and explained why in the end the district court was not crediting her opinion. What do you understand the argument to be about her being a vocational rehabilitation specialist and not a functional capacity evaluation? Just before you respond to whether you agree with her, what's the argument? I'm not sure I understand what the argument is, quite honestly, other than it appears to be, I think it was Judge Zainib that said labels over function. Because when you look at this report, two-thirds of the report is medical. Ms. Gonzalez wasn't just looking at what another doctor said the limitations were. She directly contradicted Dr. Ellison. Dr. Ellison specifically said, no mental limitations. Ms. Gonzalez said, well he's just wrong. Of course there's mental limitations. So when the district court was evaluating, when Ms. Gonzalez is resting her vocational conclusions on premises that are her own medical premises, that's what the district court was looking at. You know, if she's got faulty premises to begin with, that he has these functional limitations that no medical records. I thought what the district court was doing was looking at competing opinions, competing perspectives, which seems to be what you're saying, and then made a finding, which that's what happens under Rule 52. Yes, that's exactly right. And because plaintiff focused so largely, Mr. Slaughter focused so largely on Ms. Gonzalez's report, there was a little more time spent on Ms. Gonzalez's report and why the district court didn't find it persuasive. And the primary reason he didn't find it persuasive was that the medical analysis that Ms. Gonzalez employed directly contradicted what the treating physician had to say, what the medical records had to say. It contradicted all of the other medical evidence. So the conclusions from that report were found to be unreliable or unpersuasive. If what Mr. Davis is trying to say is that the district court was unaware that she was not a treating physician, I don't see that at all. I agree. I think the district court was well aware that she was not a treating physician. I agree. And again, I think that that played into how the district court exercised its discretion to weigh the evidence. And the court looked at her opinions about the functional capacity, which were, as you said, the foundation for any vocational opinions. I think it found that they weren't reliable because she didn't have that kind of training and didn't do what was necessary. Yes, as well as being directly contradictory to the medical professionals who had offered opinions about functional capacity. So yes, not only was there not, I think the district court specifically says, no physical examination. But again, vocationally, we maybe wouldn't expect that. But those were all factors. Because there came a point in time after the hospitalization and some of the treatment of that, that Dr. Ellison reached a conclusion that that was that the treatment, that there had been some success with the treatment and that Mr. Slaughter would be able to go on with his life, right? And so what I read the district court to do was say, I'm aware that Gonzalez has reached a contrary conclusion, but I'm crediting the cardiologist that treated the heart condition that's giving rise to the underlying problems. Did the district court do anything else? No, other than consider the other evidence as well. But yes, that is sort of the gist of it. The district court, again, did exactly what the district court is supposed to do. Considered evidence from every source and decided which evidence he thought was more credible, which evidence he was going to give additional weight to, weighed that evidence and came to the conclusion that Mr. Slaughter failed to establish that he satisfied the plan's requirement for disability and payment of benefits. And that's exactly what the court is supposed to do. And at least under Rule 52. Yes. Right? I mean, if everyone agreed it's not Rule 52, it's summary judgment, well, then the argument might shift a little bit. But Judge St. Eve established up front that Rule 52 is what's framing this. That's exactly right. And that's how we frame ERISA disability cases for exactly this kind of reason. Because, again, theoretically, we'd hope there'd be evidence, at least some on both sides, or why are we here? Right? So there's pretty much always going to be in a disability case at least some evidence on each side. So Rule 52 is what has been determined to be the appropriate standard for the district court to apply so that the district court can make those fact findings like the court did in this case after weighing all of the evidence. And as long as the district court's finding is plausible in light of the totality of the evidence, which it clearly is here, then there is no clear error and the district court must be affirmed. Thank you, Ms. Herring. Mr. Davis, we'll go back to you now for rebuttal argument. Yeah. For what it's worth, Judge Scudder, I just want to point out in our criticism of the functional capacity evaluation with vocational analysis comes from the district court's own words. And the district court, in two instances, only applied the Scanlon case, Scanlon v. Life Insurance North America, to talk about and evaluating the reliability of functional capacity evaluations. Courts are free to weigh various factors based on individual circumstances of the assessment. And then also to say explaining courts should consider whether the results of a functional capacity evaluation are consistent or conflict with other medical examinations. I think that's the confusion is that the district court was putting weight on and scrutiny on vocational evaluation that it was some type of medical assessment. And I understand, Judge St. Eve, that there are portions of it that read that Dr. Gonzalez is acting in some way as interpreting that medical information. But that is part of the vocational evaluation, is to look at those medical records. Then why wouldn't it be appropriate, those medical opinions that underlie the vocational opinion, why wouldn't it be appropriate for the district court to assess the reliability of the underlying foundation, which is what the court was doing here? I think it is, but I don't think it's clear that in looking at that credibility, that the district court was looking through the proper lens. It appears from the court's own decision that it was applying the Scanlon case, which talks about functional capacity evaluations, and those are different requirements for the physical medical evaluation. So is the argument, therefore, that in substance what the district court did is lost track of the fact that Gonzalez did not perform a physical examination? I'm not sure, Judge. All I can do is look at what the district court wrote, and the district court applied case law dealing with functional capacity evaluations in order to discount the vocational report, in the district court's own opinion. But ultimately, I do think that all of this does come down to what is incorporated into that definition of a job, which is what the district court pointed to, the U.S. Department of Labor definition, and it says, jobs are sedentary if walking and standing are required only occasionally. And I do apologize. I did say two-thirds. I meant one-third. But only occasionally is not never. Only occasionally is not only eight hours a day. And even though there was Boeing-specific requirements that he did walk in this plant, that is very consistent with the definition of this job, any sedentary job, but specifically the systems and engineering job in the national economy. And there is... Why didn't Dr. Elston's opinion about the amount he could stand and walk satisfy that? Well what they're doing is combining the two. So they're saying, well, you can stand for two hours, you can walk for one hour, that's three hours, so that's combined. But you have to be able to stand three hours and walk three hours. And or. So if the job requires standing or walking, it has to be either one. You can't combine the two. That's very different. You could stand at your desk, but if you had to walk across the plant as part of your job, you couldn't accomplish that if you are past your capacity to do that. And so I think that is where the vocational analysis in its ultimate form, as well as the social security determination, which is also a hybrid vocational analysis that was just counted by the court. There's vocational evidence here, which I think was air in the way that the court handled it. Thank you Mr. Davis. Thank you Ms. Herring. The case will be taken under advisement.